UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
────────────────────────────────────

AMY LYNN RYMER,

                              Plaintiff,        **No. 1:12-CV-0644(MAT)**

                v.                              **DECISION AND ORDER**

CAROLYN W. COLVIN, Commissioner
of Social Security,

                              Defendant.

────────────────────────────────────

## <u>INTRODUCTION</u>

Plaintiff Amy Lynn Rymer ("Plaintiff"), who is represented by counsel, brings this action pursuant to the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") that Plaintiff was not entitled to Disability Insurance Benefits ("DIB") under Title II of the Act or eligible for Supplemental Security Income ("SSI") under Title XVI of the Act. This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Dkt.##12, 20. For the reasons that follow, Plaintiff's motion is granted, and the Commissioner's cross-motion is denied.

## BACKGROUND

Plaintiff filed an application for SSI on January 22, 2008, and an application for DIB on February 8, 2008, alleging disability since February 1, 2007, due to bipolar disorder, depression, and anxiety. T.136-40, 166.[1] Following the initial denial of those applications, Plaintiff requested a hearing, which was held via videoconference before ALJ Jennifer Whang on November 2, 2010. T.12-34.

Considering the case de novo and applying the five-step analysis contained in the Social Security Administration's regulations,[2] the ALJ made the following findings: (1) Plaintiff had not engaged in substantial gainful activity since February 1, 2007, her alleged disability onset date; (2) Plaintiff's bipolar disorder, anxiety, post-traumatic stress disorder ("PTSD"), and personality disorder were severe impairments; (3) her impairments did not meet or equal a listed impairment; and she retained the residual functional capacity ("RFC") to perform work at all exertional levels, except that she was limited to simple, routine, and repetitive tasks, required a low-stress job, and should have only occasional direct interaction with others; (4) Plaintiff could not return to her past relevant work; and (5) Plaintiff could

---

[1] Citations to "T_." refer to pages in the certified copy of the administrative transcript, filed by the Commissioner in connection with her answer to the complaint.

[2] See 20 C.F.R. §§ 404.1520, 416.920.

perform work that existed in significant numbers in the national economy. T.42-49.

The ALJ's determination became the final decision of the Commissioner when the Appeals Council denied review on May 8, 2012. T.1-4. Plaintiff timely commenced the instant action. Dkt. #1.

**DISCUSSION**

I.   **General Legal Principles**

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Section 405(g) provides that the District Court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (2007). The section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record.

When determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). Section 405(g) limits the scope of the Court's review to two inquiries: determining

-Page 3-

whether the Commissioner's findings were supported by substantial evidence in the record as a whole, and whether the Commissioner's conclusions are based upon an erroneous legal standard. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).

**II.  <u>Relevant Medical Evidence</u>**

Plaintiff was treated at Niagara Family Health Center beginning in 2007. On March 30, 2007, Plaintiff reported that she had been diagnosed with bipolar disorder, and she complained of increased depression, suicidal thoughts, and uncontrolled anger. T.284. She had been prescribed Effexor but it caused her to have difficulty sleeping. T.287. She was advised to take Effexor as early as possible in the morning, and Elavil was prescribed to help her sleep. <u>Id.</u>

On July 3, 2007, Plaintiff complained of worsening depression. She expressed suicidal thoughts, stating that she did not want to live anymore. Plaintiff was crying, had scratches/lacerations on her forearms, and appeared depressed and disheveled. T.197. The nurse practitioner found that Plaintiff was a threat to herself and required a higher level of care for stabilization. <u>Id.</u> Plaintiff was transported by ambulance to Buffalo General Hospital, where she remained for nine days in the inpatient unit. T.274-75. Upon discharge, Plaintiff was prescribed Elavil, Depakote, and Celexa, and Effexor was discontinued. T.275. She was to follow up with Lake Shore Behavioral Health ("Lake Shore"). <u>Id.</u>

On July 16 and 31, 2007, Plaintiff sought treatment at Lake Shore, where she reported mood instability, irritability, periods of depression, anger outbursts, "cutting" and suicidal gesturing, and dissociation since age 16. Over the past three years, her symptoms had been worsening, and she had difficulty maintaining consistent employment as a result. T.212. Id. her diagnoses were bipolar disorder, not otherwise specified; rule out post-traumatic stress disorder and personality disorder; and rule out borderline personality disorder. T.216. Her Global Assessment of Functioning Score ("GAF") was 54, indicating moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).[3] American Psychiatric Ass'n Diagnostic & Statistical Manual of Mental Disorders ("DSM-IV") at 34 (4th ed. 2000).

In August 2007, Plaintiff went to Erie County Medical Center ("ECMC"), stating that she wanted to hurt herself following an argument with her boyfriend. T.380-97. She denied lethality, and stated that she did not believe her current Depakote dosage was

---

[3] The GAF scale indicates the clinician's overall judgment of a person's level of psychological, social, and occupational functioning. The GAF scale ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest. GAF is no longer used by Volume V of the DSM, however, Volume IV of the DSM was in effect at the time of Plaintiff's treatment. See Vanterpool v. Colvin, No. 12-CV-8789, 2014 WL 1979925, at *2 n. 2 (S.D.N.Y. May 15, 2014) (citation omitted).

working. A mental status examination was unremarkable, and she was prescribed Klonopin for anxiety. T.386-88.

The next day, Plaintiff underwent a comprehensive behavioral health assessment at Lake Shore. She reported hearing voices, had superficially cut her forearms in June and July of 2007, and had experienced suicidal and homicidal thoughts in the past. T.226. She was compliant with treatment medications. T.227. She had a depressed mood; her affect was appropriate but exaggerated; her remote memory and insight were fair; and her judgment was impaired. T.228-30.

In December 2007, Plaintiff exhibited moderately severe anxiety, depression, elevated mood and grandiosity; mild suicidality and guilt; very mild hostility, suspiciousness, blunted affect, emotional withdrawal, and distractibility; and no hallucinations, unusual thought content, bizarre behavior, self neglect, disorientation, motor retardation or hyperactivity, tension, or uncooperativeness. T.236. Plaintiff was noted to be fairly stable and not in distress. However, Plaintiff exhibited depressive thought content during a January 2008 visit to Lake Shore. T.196, 244-45.

On January 28, 2008, Plaintiff's treating psychiatrist, Dr. Hong Rak Choe, provided a functional assessment. He stated that her diagnoses were bipolar and borderline personality disorder, and that she exhibited symptoms of anhedonia, appetite disturbance with

change in weight, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, irritability, agitation, racing thought, euphoria, grandiosity, and depressive episodes. T.203-210. Dr. Choe observed that Plaintiff had been hospitalized due to decompensation and had a history of self-mutilation. T.206-07. She had been involved in abusive relationships and had flashbacks of past trauma. She reported being fired from a job due to inability to keep a schedule, and her depressive symptoms kept her home-bound and isolated. T.207, 210-11. Dr. Choe opined that Plaintiff had moderate restrictions in her activities of daily living and marked difficulties in maintaining social functioning. T. 204, 208. He also found that she had deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner, and that she experienced repeated episodes of deterioration or decompensation in work or work-like settings. T. 204-05, 208-09. She was extremely impaired in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Plaintiff was moderately limited in nearly every other category. T.208-10.

Plaintiff underwent consultative psychiatric evaluation on April 10, 2008, with Robert Hill, Ph.D. T.249. Dr. Hill noted that Plaintiff's mother had driven her to the evaluation. Id. Plaintiff reported being suspended from past work due to yelling at her boss

and  being fired for failing to show up for work. <u>Id.</u> She had been receiving mental health treatment from Lake Shore since July 2007, and was currently taking Depakote and Celexa. T.250. She reported that the medications somewhat improved her symptoms of depression, mania, and anxiety, but did not resolve them. Plaintiff told Dr. Hill that she lived with her two children and boyfriend, and could cook, clean, do laundry, take care of personal hygiene, and shop, but avoided going shopping alone and went with her mother. T.253. Plaintiff reported having no hobbies. During periods of elevated mood she would not sleep for two or three days. T.251.

Dr. Hill's noted that Plaintiff had slightly disheveled hair but otherwise was neat with adequate hygiene. T.252. Her mood was somewhat dysthymic, her memory skills were mildly impaired due to some anxiety about the evaluation, and she had average to below average cognitive functioning. T.252-53. Insight and judgment "appeared to be fair." T.253. Dr. Hill noted that Plaintiff may" have trouble relating adequately with others and dealing with stress. T.253. She may have vocational difficulties due to distractibility, fatigue, lack of motivation, depression, anxiety, borderline personality features, and symptoms of her bipolar disorder. <u>Id.</u> She may do better with treatment and in a "low stress, low contact environment". <u>Id.</u> Dr. Hill concluded that despite her impairments caused by her symptoms, Plaintiff could follow and understand simple instructions, and was capable of

performing some simple tasks independently with supervision. Id. Diagnoses were bipolar disorder, not otherwise specified, and personality disorder with borderline features. T.249.

On July 22, 2008, State Agency psychological consultant M. Mohan, Ph.D., reviewed the evidence and performed a Psychiatric Review Technique. T. 255-68. Dr. Mohan found that Plaintiff had bipolar disorder, PTSD, and personality disorder resulting in mild restrictions in daily activities; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace; with one or two episodes of deterioration lasting for an extended duration. Id. As part of his functional assessment he noted that Plaintiff's memory, attention, and concentration were somewhat limited; she was able to take care of her basic personal needs; and her social functioning "was of some concern." T.271. Plaintiff retained the ability to follow simple verbal directions and maintain focus on simple tasks in a low-demand, low-contact work environment. Id.

In July 2009, Plaintiff reported to staff at Lake Shore that she was having symptoms of psychosis, difficulty controlling her anxiety, and difficulty using coping skills and managing family stressors. T.345-50. She stated she had difficulty with daily activities and concentration, and reported new symptoms of increased anxiety and fear of leaving the home which "which sound[ed] like agoraphobia."  T.350.

On December 23, 2009, Plaintiff went to ECMC, again reporting suicidal ideation. T.406. She was diagnosed with borderline IQ, borderline personality traits, and adjustment disorder. T.407-08. Her GAF score at that time was 41-50.

### III. <u>Non-Medical Evidence</u>

At the time of her hearing, Plaintiff was 31 years-old with a GED. She previously had worked as a bill collector, school bus driver, gas station attendant, cashier, and line worker. T.21, 136, 158-65, 168. She testified that she had been terminated from her last job because she did not collect enough debts. T.21. Plaintiff did not believe she could perform a full-time job because she could not deal with people, would not be able to meet performance expectations, and would not be able to use public transportation to get to a job. T.28.

Plaintiff testified that she lived in an apartment with her two daughters, ages 5 and 11. She had a driver's license, but did not drive because she did not like to go out in public. T.20. She did not take public transportation. <u>Id.</u> Her daily routine consisted of getting up in the morning and visiting with her downstairs neighbor, and getting her daughters ready for school and onto the bus. After that, she would read, clean the house, prepare dinner, or crochet on a good day. T.24. If she was having a bad day, however, she would sleep. <u>Id.</u> Plaintiff testified that she had bad days every couple of days. <u>Id.</u>

Plaintiff had to have a friend take her to her appointments and do her grocery shopping for her. Id. She had been trying to take short walks outside, but could only walk the distance of about two houses before she needed to return home because she became too anxious. She told the ALJ that her legs would shake, her breathing would get heavy, and she thought people were talking about her. T.25.

Over the past year and a half, her problems going out in public had gradually worsened. T.22. She received mental health treatment at Lake Shore, seeing her counselor every two weeks and her psychiatrist once a month. T.22-23. She stated that her treatment was going "pretty good," and that she was taking Depakote, Celexa, and Abilify, which helped "somewhat" but caused sleepiness. Id. Plaintiff said she had been diagnosed with bipolar disorder, and she experienced depressive and manic symptoms. T.25-27. While on a "high" she felt "on top of the world," but could not complete tasks. During a "low", she would sleep all day. T.26-27. She testified that she sometimes intentionally hurt herself, and had cut her arms two months before. During a depressive episode within the past two weeks, she felt as though she "didn't want to be here anymore." T.28-29.

The ALJ also heard testimony from Vocational Expert ("VE") Bassey Duke. T.31-33. The ALJ posed a hypothetical involving a claimant of the same age and with the same education and work

experience as Plaintiff, with no exertional limitations. This
hypothetical individual was limited to simple, routine, and
repetitive tasks; required a low-stress job (defined as having only
occasional decision-making and occasional changes in the work
setting); and should only have occasional direct interaction with
the public, co-workers, and supervisors. T.31. The VE responded
that this person could not perform any of Plaintiff's past work,
but could perform unskilled, light work, including the jobs of mail
clerk, stock checker, and assembler helper, all of which existed in
significant numbers in the national economy. T.30.

## IV.  Plaintiff's Contentions

### A.   Failure to Properly Apply the Treating Physician Rule

Plaintiff argues the ALJ failed to properly apply the treating
physician rule, and erroneously assigned the opinion of her
treating psychiatrist, Dr. Choe, only "slight weight". See Pl. Mem.
(Dkt.# 12-1) at 11-15.

A treating physician's opinion is entitled to "controlling
weight" when it is "well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with
substantial evidence in [the] case record." 20 C.F.R.
§§ 404.1527(c)(2), 416.927(c)(2); see also Rosa v. Callahan, 168
F.3d 72, 78-79 (2d Cir. 1999); Schisler v. Sullivan, 3 F.3d 563,
567 (2d Cir. 1993). When an ALJ refuses to assign a treating
physician's opinion controlling weight, she must consider a number

of factors to determine the appropriate weight to assign, including (1) the frequency of the physician's examination of the claimant, and the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the opinion is from a specialist; and (5) other factors brought to the ALJ's attention that tend to support or contradict the opinion. See 20 C.F.R. § 404.1527(c). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citation omitted); see also Halloran, 362 F.3d at 32.

In the present case, Dr. Choe's detailed medical source statement should have been given controlling weight with regard to the nature, extent and severity of Plaintiff's mental impairments. Dr. Choe is a specialist in psychiatry who had treated Plaintiff on a consistent basis from July 6, 2007, to January 17, 2008, when he completed his medical source statement. T.203-207, 208-211. Thus, his opinion was supported by clinical observations of Plaintiff gained during multiple examinations over six months of treatment. See T.232, 241, 242, 245, 246, 320-322, 325-327, 355-377. In addition, Dr. Choe's opinion is consistent with other substantial evidence in the record. For example, when Plaintiff was evaluated at ECMC on December 3, 2009, her GAF was quite low (41-50),

indicating serious symptoms or serious impairments in social, occupational, or school functioning. <u>See</u> DSM-IV-TR, p.34. Consultative examiner Dr. Hill agreed that Plaintiff had significant psychological impairments (borderline personality disorder, depression, anxiety and bipolar disorder), although he appeared to underestimate the effect of her resultant symptoms (depression, anxiety, distractibility, fatigue, lack of motivation, borderline personality features), stating that they "may" result in difficulties in coping with stress and a normal work environment. Even the agency review psychiatrist acknowledged, after reviewing the record, that Plaintiff's social functioning "was of some concern". T.271.

The ALJ, however, only gave "slight weight" to Dr. Choe's opinion because his functional assessment of Plaintiff reflected observations from 2007 and 2008, when Plaintiff was recovering from her July 2007 decompensation episode. According to the ALJ, subsequent evidence consisting of medication monitoring notes demonstrated that the RFC assessment Dr. Choe issued in January of 2008 was no longer accurate because by that point, Plaintiff was fairly stable with current medication. There is, however, no opinion evidence cited in support of the ALJ's conclusion. Furthermore, the record indicates that Plaintiff continued to exhibit mood swings, poor judgment, difficulty in performing daily activities and maintaining concentration, and began to exhibit new

symptoms of agoraphobia. Also, she sought emergency treatment for suicidal ideation the following year in 2009. T.350, 402-14. Thus, the ALJ's reasons for discounting Dr. Choe's medical source statement were not supported either by a competent opinion from another acceptable medical source or objective evidence in the record. Her reasons for discounting Dr. Choe's opinion cannot be said to constitute "good reasons" as required by the regulations. See Martinez v. Colvin, No. 12-CV-05713, 2014 WL 4467709, at *12 (S.D.N.Y. June 27, 2014) ("Reasons that are conclusory fail the 'good reasons' requirement.") (citing Gunter v. Commissioner of Soc. Sec., 361 F. App'x 197, 199-200 (2d Cir. 2012) (ALJ's statement that treating physician's opinion because it was "not consistent with substantial evidence" fell "far short of the ALJ's duty to provide 'good reasons'") (citation omitted)).

## B.   Erroneous Finding Regarding Listing 12.04

The ALJ found that Plaintiffs' impairments were not of the severity to meet or equal Listing 12.04 (Affective Disorders). T44-45. Plaintiff argues that in making this determination, the ALJ did not reference or evaluate the opinion of treating physician Dr. Choe, who opined that Plaintiff did meet the criteria for this listing. T.203-05.

Section 12.04 defines affective disorder as an impairment, stating that it is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."

20 C.F.R. Pt. 404, Subpt. P, App'x 1, 12.04. In order to meet Listing 12.04, the claimant's impairment must satisfy the requirements of both Paragraphs A and B, or of Paragraph C. Id. Paragraph A is met when the claimant suffers from depressive syndrome and at least four listed symptoms (e.g., suicidal thoughts, anhedonia, sleep disturbance, feelings or guilt or worthlessnes, difficulty concentrating or thinking, and decreased energy); or manic syndrome; or bipolar syndrome. See 20. C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(A)(1)(a)-(i), (2), (3).

An impairment satisfies the requirements of Paragraph B if there are at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and/or repeated episodes of decompensation, each of extended duration. Id., § 12.04(B)(1)-(4). As discussed further below, had the ALJ properly considered Dr. Choe's opinion and assigned it the appropriate weight, a finding of disability was required.

In comparing Plaintiff's symptoms and limitations to the criteria in Listing 12.04, the ALJ found that Plaintiff had mild restrictions in activities of daily living; moderate difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. T.44. She further found that Plaintiff had experienced one to two episodes of decompensation,

each of extended duration. Id. With regard to social functioning, the ALJ found that Plaintiff had only moderate difficulties on the basis that there was "no indication in the record that Plaintiff had been diagnosed with agoraphobia or panic attacks" to support Plaintiff's claims of difficulty functioning in public. T.44. This conclusion is not supported by substantial evidence in the record, which is replete with references to Plaintiff's isolative and anxious behavior. Plaintiff reported agoraphobic symptoms to her physicians, who observed her to be socially withdrawn. Plaintiffs consistently testified and reported in her disability forms that she did not drive, did not take public transportation, did not grocery shop, had to have someone take her to her medical appointments, and could only walk several houses away from her apartment before experiencing intense anxiety. T.24-25, 151-55, 206, 231, 236, 251, 342, 350. Moreover, the ALJ did not discuss how Plaintiff's other documented symptoms, including poor judgment, irritability, agitation, racing thoughts, and manic-depressive behavior (occasionally resulting in suicidal thoughts) detrimentally affected her social functioning.

As for episodes of decompensation, the ALJ downplayed the record evidence, finding that Plaintiff's mental condition improved significantly since her discharge from inpatient treatment at Buffalo General in 2007, that her functioning improved with the administering of new medications, and that upon discharge Plaintiff

showed only moderate symptoms or impairments according to her assigned GAF of 60. T.44. The ALJ failed to mention, however, that Plaintiff testified to cutting her arms two months prior to the disability hearing in November 2010, and, only two weeks prior to the hearing, was having suicidal ideation. T.28-29, 44. Nor did the ALJ discuss Plaintiff's evaluation at the emergency room in December 2009, when her GAF score was 41-50, indicating serious symptoms or any serious impairment in social, occupational, or school functioning. T.408. It is also significant that Plaintiff was prescribed multiple medications for her various mental disorders throughout the period of record, including Depakote, Celexa, Elavil, Vistaril, which, when adjusted or modified, caused symptom flares indicative of decompensation. T.247-48.

Treating psychiatrist Dr. Choe, whose opinion the Court has found to be entitled to controlling weight, diagnosed Plaintiff with both bipolar disorder and borderline personality disorder. He further opined that Plaintiff suffered from the symptoms in Listing § 12.04 paragraph (A)(1) (depressive syndrome) and paragraph A(2) (manic syndrome). With regard to the paragraph B criteria, Dr. Choe found that Plaintiff had moderate restrictions in activities of daily living; marked difficulties in maintaining social functioning; and marked deficiencies of concentration, persistence, or pace that would result in frequent failure to timely complete tasks. Dr. Choe also stated that Plaintiff also

experienced repeated episodes of deterioration or decompensation in work or work-like settings. T.204-06, 208-10. Based on Dr. Choe's medical source statement, and the objective medical evidence in the record, Plaintiff has a mood disturbance, accompanied by a manic-depressive syndrome. It is of the required level of severity to meet Listing 12.04 because, based on Dr. Choe's opinion and the objective medical evidence, the requirements in both paragraphs A and B are satisfied.

### C.  Erroneous RFC Assessment

Plaintiff contends that the ALJ's RFC assessment was not supported by substantial evidence and was marred by her error in evaluating the treating psychiatrist's opinion. The ALJ concluded that Plaintiff was capable of working at all exertional levels with several non-exertional limitations: She is limited to simple, routine, and repetitive tasks; requires a low-stress job; and should only have occasional direct interaction with the public, coworkers, and supervisors. T.45. The ALJ stated that this RFC was "formulated based on the medical opinions, treating and evaluative evidence in the record, and the claimant's testimony to the extent they were supported by the record as a whole." T.47. The opinions relied upon by the ALJ (the non-examining State Agency review consultant, Dr. Mohan, and the consultative examiner, Dr. Hill) were based upon an incomplete medical record; approximately half of the record was submitted after their opinions were issued,

including Plaintiff's 2009 emergency room visit. T.45; 273-414. There is no basis for the ALJ to have concluded that Plaintiff's functional assessment had improved since 2008, when treating psychiatrist Dr. Choe issued his medical source statement in 2008. The ALJ thus arbitrarily substituted her own judgment for a competent medical opinion. Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999).

Furthermore, the ALJ assigned too much relative weight to the opinions provided by consultative examiner Dr. Hill, who only saw Plaintiff on one occasion; and the non-examining State Agency review consultant, who only reviewed Plaintiff's medical records, which were incomplete. See Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990) ("[I]n evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight.") (citation omitted); see also Torres v. Bowen, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988) ("[C]onsultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.").

Dr. Choe, in contrast, specifically assessed Plaintiff's work-related abilities with the benefit of having observed Plaintiff during a months-long treatment relationship. He found "marked" limitations in Plaintiff's abilities to understand and remember detailed instructions; carry out detailed instructions; maintain

attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with and proximity with others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; accept criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others. T.205-206. Dr. Choe rated as "extremely limited" Plaintiff's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. T.205.

Thus, in addition to his opinion that Plaintiff's impairments were severe enough to meet Listing 12.04, Dr. Choe identified numerous functional limitations caused by her psychological impairments that preclude Plaintiff from performing the mental demands of unskilled work. See Peck v. Astrue, No. C 09-2600 SBA, 2010 WL 3790597, at *13 (N.D. Cal. Sept. 27, 2010) ("[E]ven unskilled work has basic mental demands. Thus, if a claimant is unable to meet those basic demands, [s]he is deemed disabled.") (citing SSR 85-15, 1985 WL 56857, *4 (S.S.A. 1985)).

## V.   Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without

remanding for a rehearing. Remand for additional fact development may be appropriate if "there are gaps in the administrative record or the ALJ has applied an improper legal standard." <u>Rosa v. Callahan</u>, 168 F.3d 72, 82-3 (2d Cir. 1999). Because the record persuasively demonstrates Plaintiff's disability, <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980), and because there is no reason to conclude that the additional evidence might support the Commissioner's claim that Plaintiff is not disabled, <u>Butts v. Barnhart</u>, 388 F.3d 377, 385-86 (2d Cir. 2004), the standard for directing a remand for calculation of benefits has been met.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. #12) is granted, and the Commissioner's cross-motion for judgment on the pleadings (Dkt. #20) is denied. It is hereby ordered that this matter is reversed and remanded to the Commissioner solely for the calculation and payment of benefits.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:     Rochester, New York
           October 20, 2014